# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| SUPERIOR CREDIT UNION, INC.<br>39 Oak Street<br>Amelia, OH 45102<br><br>    Plaintiff,<br><br>vs.<br><br>CUMIS INSURANCE SOCIETY, INC.<br>2000 Heritage Way<br>Waverly, IA 50677<br><br>    Defendant. | Civil Action No. 1:19-cv-0073<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Now comes the Plaintiff, Superior Credit Union, by and through counsel, and for its Complaint against Defendant, CUMIS Insurance Society, Inc., states as follows:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff, Superior Credit Union, is an not for profit corporation incorporated under the laws of the state of Ohio and is an Ohio state chartered credit union conducting business in the state of Ohio. Plaintiff is the successor in interest by merger to the former Classic Federal Credit Union ("Classic") located in Amelia, Ohio.

2. Defendant, CUMIS Insurance Society, Inc. ("CUMIS"), is an Iowa corporation that sells insurance policies, including fidelity bond coverage, with its principal place of business located at 2000 Heritage Way, Waverly, IA 50677.

3. Defendant is authorized by the Ohio Department of Insurance to transact property and casualty insurance business in the state of Ohio.

03361560-1

4. Defendant conducted business within the state of Ohio when it entered into an insurance contract with Classic, an Ohio credit union, and thus this Court has personal jurisdiction over Defendant.

5. This Court has diversity jurisdiction over this dispute pursuant to 28 U.S.C. §1332.

6. For purposes of diversity jurisdiction, Defendant is a citizen of the state of Iowa as that is its state of incorporation and the location of its principal place of business.

7. For purposes of diversity jurisdiction, Plaintiff is a citizen of the state of Ohio as that is its state if incorporation and its principal place of business is located at 4230 Elida Road, Lima, Allen County, Ohio.

8. Plaintiff has been damaged in an amount exceeding $75,000, exclusive of interest and costs.

## STATEMENT OF FACTS COMMON TO ALL CLAIMS

9. Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully rewritten herein.

10. Defendant is an insurance company engaged in the sale of insurance products, including, but not limited to, fidelity bond coverage policy for credit unions.

11. Ohio law contemplates that casualty insurance includes fidelity insurance. *See,* Ohio Rev. Code Ann. §3937.01.

12. At all times relevant hereto, Defendant, for and in consideration of a valuable premium paid by Plaintiff's predecessor in interest, Classic, issued a fidelity bond coverage policy agreement (the "Bond" or "insurance contract") to Classic that insured Classic

against losses caused by, *inter alia*, an employee's Failure to Faithfully Perform His/Her Trust.

13. In its Bond, Defendant provided Classic with a contractual definition of "Failure to Faithfully Perform His/Her Trust" (a coverage also commonly known as "lack of faithful performance") which is defined in the Bond as "acting in conscious disregard of your established and enforced share or deposit policies or that portion of your established and enforced lending policy which sets out the parameters which must be met in order for a 'loan' to be approved."

14. Defendant's Bond provided coverage to Classic for losses arising out of the lack of faithful performance of its employees in the maximum amount of $1,500,000, less a $5,000 deductible.

15. In late 2013, Classic vetted and implemented a lending program whereby a borrower with limited credit, no credit, or derogatory credit could qualify for a loan for the purchase of a used vehicle conditioned upon the vehicle having a Global Positioning Satellite ("GPS") device mounted onto the engine block (the "GPS Program").

16. The GPS device mounted on the vehicle securing a loan under the GPS Program would alert a borrower after a required loan payment was not timely made. Subsequently, if a delinquent loan was not brought current, the GPS device could render a vehicle inoperable until a borrower's overdue loan payment was made.

17. Prior to the implementation of the GPS Program, the credit union enacted specific lending policies designed to protect the credit union by mitigating risk associated with GPS Program loans (together as the "GPS Program Lending Policy").

18. At all times relevant hereto, all loans originated under the GPS Program were only to be approved in compliance with the credit union's established and enforced GPS Program Lending Policy.

19. At all times relevant hereto, Classic's former employees, Jason Radachi ("Radachi") and Kyle Norsworthy ("Norsworthy") (collectively referred to as the "Claim Principals"), were duly authorized Loan Officers who had the authority to approve loans in accordance with Classic's established and enforced lending policies.

20. At all times relevant hereto and while Defendant's Bond was in effect, Radachi and Norsworthy failed to faithfully perform their duties when they approved loans to borrowers in violation of the credit union's established and enforced GPS Program Lending Policy.

21. As a result of the Claim Principals' conscious disregard of the credit union's established and enforced GPS Program Lending Policy, Plaintiff sustained monetary damages in excess of $650,000.

22. Plaintiff's predecessor Classic filed its fidelity bond claim with Defendant on December 21, 2017, by submission of a Proof of Loss as required by Defendant.

23. Classic's Proof of Loss sought fidelity insurance coverage for 127 GPS Program loans approved by the Claim Principals in conscious disregard of the credit union's established and enforced GPS Program Lending Policy which caused Classic a loss of $720,490.53, plus $25,000 in audit expense coverage available under the Bond.

24. Classic filed its fidelity bond claim in compliance with all conditions of Defendant's Bond.

25. During its claim investigation, over the course of three days, from February 26, 2018 through February 28, 2018, Defendant's retained counsel interviewed five members of Classic's Board of Directors (including Classic's Chairperson and Vice-Chairperson), Classic's Supervisory Committee Chairperson, four Classic employees (including two loan officers who also approved GPS Program loans) and Classic's interim CEO/Manager.

26. During the interviews conducted by Defendant's counsel, each member of Classic's Board of Directors independently confirmed that they had no knowledge that a potential loss insured by the fidelity bond with CUMIS had incurred until facts relating to a potential loss were first discussed at a Board Meeting on or about February 3, 2017.

27. Defendant's retained counsel also interviewed two Classic Loan Officers who are not named as Claim Principals in the Proof of Loss. During the interviews, each Loan Officer independently confirmed that: (1) they were given copies of Classic's GPS Program Lending Policy; (2) copies of Classic's lending policies (including the GPS Program Lending Policy) were available on Classic's shared computer drive; and (3) they were aware of the parameters of the GPS Program Lending Policy.

28. On April 13, 2018, Classic filed its Supplemental Proof of Loss seeking an additional $40,258.76 in fidelity insurance coverage for 15 non-GPS Program loans approved by the Claim Principals to GPS Program borrowers in violation of Classic's lending policies.

29. On May 21, 2018, following its investigation, Defendant offered payment in the amount of $214,012.11 to reimburse Classic for its covered losses. The $214,012.11

owed by Defendant to Classic was for 32 GPS Program loan losses and 15 non-GPS Program loan losses (a total of 47 loans) underwritten by the Claim Principals in violation of the GPS Program Lending Policy and covered under the lack of faithful performance provision of the CUMIS Bond.

30. By letter dated June 21, 2018, Plaintiff requested an explanation for why Defendant decided only 32 GPS Program loans were covered under the lack of faithful performance provision of the CUMIS Bond when many other GPS Program loans approved by the Claim Principals and submitted to Defendant contained the exact same, or worse, GPS Program underwriting violations.

31. On July 25, 2018, Defendant acknowledged that an enhanced offer in the amount of $262,542.32 was owed to Plaintiff after it determined that six additional GPS Program loan losses were covered under the lack of faithful performance provision of the CUMIS Bond.

32. Defendant informed Plaintiff that its $262,542.32 offer, based upon the payment of losses for 53 loans (38 GPS Program loans and 15 non-GPS Program loans) would expire after 24 hours, if not accepted.

33. On July 25, 2018 and July 26, 2018, Plaintiff twice requested Defendant to identify the six additional GPS Program loans which Defendant had acknowledged represented covered losses. Defendant declined to identify the additional six GPS Program loans to Plaintiff.

34. By letter dated September 11, 2018, Plaintiff again requested an explanation for why only 53 loans were covered under the lack of faithful performance provision of the

CUMIS Bond when many other loans approved by the Claim Principals and submitted to Defendant contained the exact same, or worse, GPS Program underwriting violations. Defendant refused and still refuses to explain how the non-covered loan loss items of claim differed from the covered loan loss items of claim.

35. On September 24, 2018, Defendant requested that Plaintiff postpone filing a threatened lawsuit until after October 31, 2018, so that Defendant could calculate the deduction of realized income for the GPS Program loans which comprised Defendant's July 25th coverage offer of $262,542.32. Defendant's extension request was granted by Plaintiff.

36. On October 4, 2018, Defendant acknowledged that a $264,691.97 payment was owed to Plaintiff for losses covered under the lack of faithful performance provision of the CUMIS Bond. Despite being requested to do so repeatedly since July 25, 2018, at this time, Defendant finally transmitted to Plaintiff the list of all 53 loans it deemed payable under its lack of faithful performance coverage.

37. On December 18, 2018, despite previously requesting an extension to calculate the deduction of realized income and agreeing to pay a part of Classic's insurance claim based on coverage applying to an identified group of loans submitted with its insured's fidelity claim, Defendant wrote a letter to Plaintiff stating that, "...the extent of the credit union's losses is immaterial". In its letter, Defendant also informed its insured that, "...it is not productive to draw similarities between the loans I cited previously and other loans that the credit union claims are similar to them in an effort to persuade us to increase our offer."

38. Pursuant to the CUMIS Bond, Plaintiff has demanded that Defendant pay Plaintiff for its losses caused by the Claim Principals as submitted in its Proof of Loss. Defendant has refused to issue payment for all covered losses it has already acknowledged were covered under the lack of faithful performance provision of the CUMIS Bond and has been unable to offer its insured any explanation for its coverage decisions, despite Plaintiff's repeated requests that Defendant do so.

### COUNT I – BREACH OF CONTRACT

39. Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully rewritten herein.

40. Defendant entered into an insurance contract with Classic to insure it against losses caused by Classic's employees' failure to faithfully perform his/her trust. A true and accurate copy of the declaration pages of the insurance contract is attached as Exhibit 1 and is incorporated by reference.

41. Classic paid insurance premiums to Defendant to insure Plaintiff against covered losses.

42. Plaintiff and its predecessor Classic have made numerous demands upon Defendant for payment of its fidelity bond claim, which the Defendant has repeatedly and wrongfully refused to honor.

43. At all times Defendant was obligated to refrain from taking any action which would deprive Plaintiff of the benefits of the insurance contract or to cause undue hardship or harm to Plaintiff.

44. Defendant has refused and continues to refuse to pay a reasonable amount to Plaintiff to compensate it for its covered losses.

45. The conduct of Defendant constitutes a breach of contract which has caused Plaintiff to sustain a loss in an amount to be determined from the evidence at trial, but in excess of $75,000, exclusive of interest and costs.

## COUNT II – BAD FAITH

46. Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully rewritten herein.

47. As a result of issuing its Bond, Defendant owed both Plaintiff and Plaintiff's predecessor a duty to act with utmost good faith in all aspects of its relationship with Plaintiff, including a fair and unbiased consideration of Plaintiff's fidelity bond claim.

48. As a result of issuing its Bond, Defendant owed both Plaintiff and Plaintiff's predecessor a duty to act in good faith and fair dealing in all aspects of its relationship with Plaintiff, including but not limited to, a fair and unbiased consideration of Plaintiff's fidelity bond claim.

49. Defendant has breached its duties of good faith and fair dealing owed to Plaintiff under the Bond by committing the following acts and/or omissions, *inter alia*:

(a) Defendant has failed to carefully consider Plaintiff's insurance claim. Defendant agreed to pay Plaintiff's insurance claim based on a reimbursement for 53 loans, yet Defendant cannot and/or will not inform Plaintiff why several identical and/or similar GPS Program loans submitted with Classic's claim are excluded from coverage.

(b) Defendant has offered unexplained, inconsistent and misleading conclusions in its claim analysis, which solely benefit Defendant to the detriment of its insured. For example, Defendant agreed to cover loan losses where the sole GPS Program's Lending Policy violation was the Claim Principals' failure to obtain a required down payment. Despite Defendant's coverage determination as listed above, 77 other loans which contain the exact same down payment violation

        have been refused for coverage by Defendant without any explanation. Despite Plaintiff's repeated requests to do so, Defendant has failed to provide any explanation for its inconsistent and irrational analysis, other than its misrepresentation that "the extent of the credit union's losses is immaterial".

(c)     Defendant has repeatedly placed its interest ahead of those of its insured by, *inter alia*, failing to consider or acknowledge facts favorable to its insured, to the benefit of itself. For example, Defendant has failed to acknowledge or consider the fact that nearly $30,000 in commissions was earned by Claim Principals in connection with their approval of GPS Program loans or that Claim Principal Norsworthy manipulated and inflated the alleged value of vehicles securing GPS Program loans by assigning California, and not Ohio, NADA vehicle valuations to the vehicles in an attempt to inflate the amount loaned on the vehicles.

### A.    CUMIS has Created an Inaccurate Date of Discovery for its own Benefit

50.    Defendant's failure to abide by the terms of the Bond, and the duties imposed on Defendant as an insurer issuing policies in the state of Ohio, have occurred as a result of Defendant's intentional, malicious and extreme conduct, including an utter indifference to issuing payment that it admits it owes to Plaintiff and by its repeated actions of placing its interests ahead of its insured.

51.    Despite being told by each former Board of Director that the Board first discovered the Claim Principals' misconduct in February 2017, Defendant created an inaccurate date of discovery, claiming that the Board actually discovered the Claim Principals' misconduct on March 16, 2016.

52.    The fact that Defendant created an inaccurate date of discovery to disadvantage its insured is demonstrated by Defendant's coverage determination letter

dated May 21, 2016. In the letter, Defendant informed its insured that its covered losses at that time totaled $214,012.11, as calculated in the table below:

| Description | Amount |
|---|---|
| 32 Program loans issued prior to March 16, 2016, with egregious underwriting issues | $153,753.35 |
| 15 loans to Program borrowers that hadn't made the required 12 consecutive monthly payments | $40,258.76 |
| Audit expenses | $25,000 |
| Employee Dishonesty deductible | ($5,000) |
| **Total Settlement** | **$214,012.11** |

53. By asserting an inaccurate "early" discovery date of March 16, 2016, Defendant attempted to prevent coverage from approximately $293,000 in losses its insured incurred on 43 GPS Program loans approved after that date. However, Defendant immediately undercut its alleged good faith "early" discovery date by confirming coverage for several non-GPS Program loans approved after March 16, 2016.

54. After Defendant adopted its inaccurate "early" discovery date and informed its insured of the same, Classic provided Defendant with affidavits from members of its Board of Directors. Through the sworn testimony of each Board member, Defendant was again informed that the Board first learned of the misconduct of the Claim Principals in February, 2017.

55. Defendant disregarded and dismissed the contents of the affidavits and continues to assert that its false "early" discovery date of March 16, 2016 is accurate, despite continuing to confirm coverage for several loans approved after March 16, 2016.

### B. Defendant Sought to Leverage the Pending Insurance Claim

56. During the pendency of its insured's claim investigation, Defendant contacted Plaintiff on September 24, 2018 and October 2, 2018 in an attempt to schedule a meeting for the purpose of selling insurance and investment products offered by Defendant to Plaintiff, a true and accurate copy of which is attached as Exhibit 2 and incorporated by reference.

57. Plaintiff, through its Chief Executive Officer Phil Buell, informed Defendant that it would not meet and that Defendant's "reputation with our staff and Board is not good."

58. Thereafter, Defendant authored a letter dated November 26, 2018, wherein Defendant disavowed its earlier coverage determination that coverage existed for 53 GPS Program loans by claiming that, "We have yet to find the coverage requirements satisfied for the Faithful Performance Coverage or the Employee Director Dishonesty Coverage."

59. In its November 26, 2018 letter, Defendant also informed its insured that, "a risky lending decision in and of itself is not a covered loss under the Bond—particularly in a known, high-risk GPS Program such as that undertaken by Classic."

60. Defendant wrote this despite its knowledge that: (1) nowhere in its Bond are an insured's loan losses excluded from coverage by virtue of Defendant's self-characterization of loans as "risky" or "high risk"; and (2) its insured submitted a claim seeking coverage for loan losses occurring as a result of specific lending policy violations and not as a result of CUMIS' vague description of "risky lending decisions".

### C. Defendant's Conduct has Violated Ohio Insurance Law

61. In violation of Ohio law, Defendant has failed to promptly settle loan loss items of claim under its policy where liability has become reasonably clear in order to influence settlements of other loan loss items of claim.

62. Defendant has failed to affirm or deny coverage within a reasonable period of time.

63. Defendant has failed to attempt, in good faith, to effectuate prompt, fair and equitable settlement of claims after which liability has become reasonably clear.

64. Defendant has failed to act reasonably and promptly upon communications with respect to claims arising under the Bond.

65. Defendant has delayed the payment of claims by requiring the insured to submit irrelevant and duplicative information and by requesting re-interviews of credit union volunteers for no purpose other than to harass and bargain for an unfair settlement.

66. Defendant's refusal to timely pay its insured's claim is not predicated upon any reasonable justification.

67. Defendant's refusal to timely pay its insured's claim has been done in an arbitrary and capricious manner.

68. Defendant's conduct toward its insured has been focused on demonstrating its insured's fault rather than acknowledging facts which confirm coverage for its insured's payable claim.

69. The conduct of Defendant constitutes an intentional and malicious breach of good faith.

70. As a result of Defendant's engagement in unfair practices, the Plaintiff is lawfully entitled to damages allowed by law.

## COUNT III – DECLARATORY JUDGMENT

71. Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully rewritten herein.

72. Declaratory relief is sought from this Court pursuant to the Ohio Declaratory Judgment Act, Ohio Rev. Code Ann. §2721.04, regarding Defendant's breach of contractual duties to Plaintiff.

73. Declaratory relief from this Court will resolve these controversies and limit the uncertainties created by the Defendant's failure to timely issue reasonable payment for Plaintiff's covered lack of faithful performance claim under the Bond.

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

A. For compensatory damages in an amount to be determined at trial but no less than $650,000;

B. For pre-judgment and post-judgment interest;

C. For an award of punitive damages to punish and deter future conduct in an amount not to exceed the limits of due process;

D. For Plaintiff's reasonable attorney fees incurred herein;

E. For the costs of this action;

F. For a declaratory judgment; and

G. For such other relief, both legal and equitable, as may be appropriate.

Respectfully submitted,

/s/  Michael A. Galasso
Michael A. Galasso (0072470)
Robbins, Kelly, Patterson & Tucker
7 West Seventh Street, Suite 1400
Cincinnati, Ohio  45202-2417
(513) 721-3330 | (513) 721-5001 fax
*mgalasso@rkpt.com*
**Attorney for Plaintiff**

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

/s/  Michael A. Galasso
Michael A. Galasso